# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| LATOYA R., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:17-cv-02695-TWP-DML |
| | ) |
| NANCY A. BERRYHILL, Deputy Commissioner | ) |
| for Operations, Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

## ENTRY ON JUDICIAL REVIEW

Plaintiff LaToya R.,[1] proceeding *pro se*, requests judicial review of the final decision of the Deputy Commissioner for Operations of the Social Security Administration (the "Deputy Commissioner") that she was overpaid $8,388.00 in benefits certified to her as representative payee for her then-minor son ("TR") and is liable for the overpayment. For the following reasons, the Court **AFFIRMS** the decision of the Deputy Commissioner.

## I. PROCEDURAL BACKGROUND

On August 27, 2014, the Social Security Administration ("SSA") sent notice to LaToya R. informing her that she was solely liable for repayment of an overpayment totaling $8,388.00 that occurred when TR was not living with her during the months between February 2012 and January 2013, but continued to receive Supplemental Security Income ("SSI") benefits while also getting Title 4E funds from the State of Indiana to assist in paying for his living expenses. (Filing No. 14-2 at 146-47.) On October 4, 2014, LaToya R. was informed that SSA intended to reduce her own

---

[1] In an attempt to protect the privacy interests of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions.

SSI benefits by ten percent, beginning November 1, 2014, to get back the money she was overpaid. (Filing No. 14-2 at 152-55.) LaToya R. timely requested reconsideration, (Filing No. 14-2 at 156), which was denied on November 20, 2014 (Filing No. 14-2 at 160). On January 1, 2014, she requested a hearing concerning the matter. (Filing No. 14-2 at 163.) Administrative Law Judge Albert Velasquez (the "ALJ") held a hearing on January 7, 2016, at which LaToya R., unrepresented by counsel, appeared and testified. (Filing No. 36-22 at 4-22.) The ALJ issued a decision on March 22, 2016, concluding that LaToya R. was liable for the overpayment. (Filing No. 14-2 at 13.) The Appeals Council denied review on July 25, 2017. (Filing No. 14-2 at 6.) On August 9, 2017, she timely filed this civil action, asking the Court pursuant to 42 U.S.C. § 405(g) to review the final decision of the Deputy Commissioner. (Filing No. 1.)

## II. STANDARD OF REVIEW

Under the Social Security Act (the "Act"), the "findings of the [Deputy] Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ." 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The standard of review applies to overpayment determinations. *Banuelos v. Apfel*, 165 F.3d 1166, 1169 (7th Cir. 1999) (overturned on other grounds by *Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999)). The United States Supreme Court has recognized that judicial review of Social Security decisions is limited to matters for which the plaintiff has exhausted administrative review under the Act. *Mathews v. Eldridge*, 424 U.S. 319, 327 (1976) (citing 42 U.S.C. § 405(g)-(h)). "It is clear from [42 U.S.C. § 405(g)] that a district court may not consider evidence outside the certified record." *Papendick v. Sullivan*, 969 F.2d 298, 302 (7th Cir. 1992) (overturned on other grounds by *Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999)). Moreover,

2

the Commissioner is responsible for weighing the evidence, resolving conflicts and making independent findings of fact, the court may not decide the facts anew, reweigh the evidence or substitute its own judgment. *Powers v. Apfel*, 207 F.3d 431, 434-35 (7th Cir. 2000).

### III. FACTUAL BACKGROUND

On September 16, 1996, LaToya R. completed and signed a representative payee application/agreement (the "1996 agreement") to become the payee for TR's SSI benefits.[2] (Filing No. 14-2 at 80.) As part of that agreement, LaToya R. endorsed, "I may be held personally liable for repayment if I misuse the payments or if I am at fault for any overpayment of benefits." (Filing No. 35-2 at 3.) She further endorsed, "I agree to: [. . .] [n]otify the Social Security Administration when the claimant dies, leaves my custody or otherwise changes his/her living arrangements or when I no longer have responsibility for his/her care and welfare." (Filing No. 35-2 at 4.)

On January 26, 2012, the Marion Superior Court, Juvenile Division, issued an Order Regarding Children in Need of Services, after a permanency hearing, which included the appearance of LaToya R. (Filing No. 14-2 at 60.) The order concerning TR described that he had been temporarily placed at Damar Services, Inc., ("Damar"), but was spending weekends with LaToya R., and that neither LaToya R. nor the Department of Child Services ("DCS") wished to change the plan. (Filing No. 14-2 at 61; *see* Damar, https://www.damar.org/children/residential (last visited August 27, 2018) (Damar is an organization funded by the State of Indiana that provides residential care services for children with developmental and behavioral disabilities).)

---

[2] The actual 1996 agreement was not included in the certified transcript for the Court, nor a part of the administrative record before the ALJ. However, an unsigned affidavit dated January 30, 2013, recording the affirmations of a special agent of the Office of the Inspector General was included in the administrative record, (Filing No. 14-2 at 79-83), which the ALJ relied upon in his written decision, (Filing No. 14-2 at 17), and appears to be an accurate representation of the relevant terms of the 1996 agreement which was later submitted to the Court, (Filing No. 35-2). LaToya R. has not disputed the affidavit, the accuracy of the relevant affirmations contained therein, or the terms of the 1996 agreement itself at any point in the record. To whatever extent the precise wording of the contract could be material, the Court will quote to the actual 1996 agreement here.

3

The hearing resulted in a permanency plan whereby the court ordered continued current placement at Damar and the "responsibility for placement and care is granted to the Department of Child Services." (Filing No. 14-2 at 62-63.) On January 17, 2013, an order of the court following a periodic review hearing indicated that TR was still placed at Damar. (Filing No. 14-2 at 104.) DCS retained custody of TR until he was released to ResCare, an adult services provider, on May 23, 2013. (Filing No. 14-2 at 107.)

In the interim on November 23, 2012, LaToya R. completed a representative payee report, under penalty of perjury, reporting that TR had lived with her from August 1, 2011 through July 31, 2012. (Filing No. 14-2 at 65-66.)

On January 11, 2013, LaToya R., again under penalty of perjury, completed a redetermination summary for the purpose of determining continuing eligibility for TR's SSI payments. (Filing No. 14-2 at 67-70.) LaToya R. endorsed that TR "has not spent a calendar month in a hospital, nursing home, correctional facility, or any type of institution since March 1, 2012." (Filing No. 14-2 at 68.) LaToya R. was asked to describe TR's living arrangements as of May 27, 2011, March 2, 2012, and April 2, 2012, and provided only her own address for each requested date. *Id*. She endorsed that as of April 2, 2012, TR "does not get help or money from any person not living with him or any agency to pay for food, rent, mortgage payments, property insurance, property taxes, heating fuel, gas, electricity, garbage removal, water or sewerage." *Id*. She further endorsed, "There have not been any other changes in his living arrangements." *Id*.

However, on January 15, 2013, SSA contacted DCS stating that, "One of our claims reps did a redetermination interview with this child's mom yesterday, and she reported the child has been at Damar since 2/04/12. She says DCS pays for his stay there." (Filing No. 14-2 at 110.)

DCS responded that TR had been at Damar since January 26, 2012 and had received Title 4E funds from the State of Indiana against placement costs up until he had become an adult. *Id*.

After the hearing, the ALJ issued a written decision explaining his findings of fact and conclusions of law. The ALJ found that LaToya R. was the sole representative payee for TR from at least February 2012 through January 2013. ([Filing No. 14-2 at 17](#).) The ALJ noted that LaToya R. had agreed to notify SSA in the 1996 agreement if TR "leaves her custody or otherwise changes his living arrangements or when she no longer has responsibility to [sic] his care and welfare." *Id*. The ALJ further summarized the custody and living arrangement changes during the relevant period, including that DCS "was granted responsibility for the placement and care of" TR on January 26, 2012. *Id*. The ALJ noted that despite TR's removal, LaToya R. had failed to report his change of living arrangement and in fact continued to report to SSA, as noted above, that TR "lived with her and was under her care." *Id*. The ALJ found that LaToya R. "should not have received benefits as the representative payee for [TR] during this period because DCS was responsible for the care and placement of [TR] during this period. As a result, the claimant was overpaid supplemental security income benefits as a representative payee of $8,338.00 from February 2012 to January 2013." *Id*. The ALJ further found that LaToya R. was liable for paying back the "misused" benefits she received as a representative payee. ([Filing No. 14-2 at 18](#) (citing 20 C.F.R. §§ 416.635, 416.640, and 416.641(a)).)

## IV. DISCUSSION

LaToya R. has made various claims on her own behalf. When she requested reconsideration she simply stated, "this is not my overpayment." ([Filing No. 14-2 at 156](#).) When she requested a hearing, she stated, "I do not owe [an] overpayment," and "everyone in this office has lied and took my children for [their] own needs." ([Filing No. 14-2 at 163](#).)

5

LaToya R. testified at the hearing regarding the overpayment:

> That was – that was – that was [TR's], and I didn't owe it. I didn't owe it because we reported it. She was saying that I didn't report it. We reported, even the court reported it. I have this papers [sic] right here. When we went to court that it was reported by the court that he went back. It's a permanency hearing, and they, you know, we reported [TR] went back.

(Filing No. 36-22 at 10.) LaToya R. testified that TR continued to come home on the weekends after being placed at Damar. (Filing No. 36-22 at 12.) She also testified either mistakenly or falsely that TR's benefits checks were reduced because she only had him part-time.

> Q. So did you keep getting his check?
>
> A. Yeah, We reported it because they—they cut his check. When he's staying at Damar and staying with me, they cut his check.

(Filing No. 36-22 at 13.) She further testified that she had proven that she did not owe the money, but that SSA had never paid her back the money that was withheld from her benefits. (Filing No. 36-22 at 15.) LaToya R. also continued to maintain that she had reported that TR was at Damar and that the court was also supposed to notify SSA of the arrangement. (Filing No. 36-22 at 17-19.) The ALJ asked, "Well, okay, but we don't have that record. There's no – no evidence of that. So let's just say for the – that the government accidentally paid you too much money, and you should've known that was too much money because they weren't staying with you any more, right?" (Filing No. 36-22 at 19.) LaToya R. did not answer the question directly, stating, "And I reported it." *Id*. When again asked what she did with the money after TR was no longer living there, LaToya R. answered:

> They – they cut it because he comes home on the weekend. They cut his check and you know, you know I take care of him while he's at home. I feed him while he's at home. I give him allowance. They knew it. I reported it. His check is usually cut every time, you know. You know, this is like the second time because the first time, he was – he was in my mom's care, and then he wound up at Damar, and then he came home. So his check was supposed to just be cut.

6

([Filing No. 36-22 at 20](#).)  In a previous portion of the hearing, it was established that when LaToya R. referred to her own check being "cut" that she meant it had been reduced (to pay back the overpayment).  ([Filing No. 36-22 at 8](#).)  LaToya R. testified that she continued to spend the money on TR's needs while he was at home and also took him supplies while he was at Damar.  ([Filing No. 36-22 at 20](#).)

In her initial brief, LaToya R. provided little argument directly related to the decision under review, except that, "I'm [TR's] payee and they should not have his money or information." ([Filing No. 18 at 3](#).)  When asked by the Court to provide a clearer statement of her case, LaToya R. filed largely the same brief, again including what appears to be part of a notice from SSA to her dated November 10, 2014, stating that ten percent of her benefits, totaling $72.10, should not have been withheld, with the following statement, "An unintentional overpayment was not your fault. Your income and resources are barely enough to pay for basic expenses.  You can ask the agency or judge to waive repayment under 'equitable estoppel.'  A waiver means you will not have to pay …".  ([Filing No. 23 at 1-2](#).)  In her third brief, LaToya R. argues, "Clear evidence supports that I did not falsely state [anything] and [TR] was still coming home part[-]time." ([Filing No. 38 at 1](#).) LaToya R. further argues that she had proven her case and received the November 10, 2014 notice because it was "their mistake not mine."  ([Filing No. 38 at 2](#).)

The Court finds that substantial evidence supports the ALJ's determination that an overpayment occurred.  "As used in this subpart, the term *overpayment* means payment of more than the amount due for any period, including an amount of State supplementary payments which are due and administered by the Social Security Administration."  20 C.F.R. § 416.537(a) (emphasis in original).  "For purposes of this section, payment has been made when certified by the Social Security Administration to the Department of the Treasury, except that payment has not

7

been by the designated payee, or when payment was returned." *Id*. LaToya R. does not appear to dispute that an overpayment occurred, allege that she returned any of the benefits that were paid, or that she otherwise did not receive them.

The Court also finds that LaToya R. is liable for any overpayment. LaToya R. agreed as a condition of being selected as TR's representative payee in the 1996 agreement, "I may be held personally liable for repayment if I misuse the payments or if I am at fault for any overpayment of benefits." ([Filing No. 35-2 at 3](#).) The Court finds the 1996 agreement to be enforceable, inclusive of the term whereby LaToya R. agreed to be held personally liable for any overpayment, so long as she either 1) misused the payments or 2) was at fault for the overpayment.

The ALJ's decision fails to explain how the actual amount of the overpayment was determined. "The amount of an underpayment or overpayment is the difference between the amount paid to a recipient and the amount of payment actually due such a recipient for a given period." 20 C.F.R. § 416.538(a). The record contains evidence that the SSA determined that the entire amount paid to LaToya R. during the period was considered to be the total amount of overpayment, inclusive of the finding that the amount actually due to the recipient was zero dollars for each applicable month. ([Filing No. 14-2 at 136](#) (overpayment totaling $6,968.00).) The SSA ultimately determined that the total amount was $8,388.00. ([Filing No. 14-2 at 147](#) (the $6,968.00 plus an additional $1,400.00 that had been refunded by another payee whom the SSA had determined would need to be reimbursed out of the recovery from LaToya R. (whom is actually liable for the overpayment)).) The record contains evidence that establishes that TR's benefits should have been reduced. DCS paid for TR's stay at Damar and DCS was receiving Title 4E funds from the State of Indiana to cover placement costs. ([Filing No. 14-2 at 110](#).) Although the ALJ's written decision does not provide detailed analysis on how he determined the amount of

benefits that would have been actually due to TR during the period in question, he does note that DCS was granted responsibility for the placement and care of TR and DCS placed TR in a group home with Damar. The ALJ further explains that "State funds for [TR's] placement with Damar Services were: $229.00 per day from January 29, 2012 to February 29, 2012; $270.67 per day from March 1, 2012 to December 31, 2012; and $334.42 per day from January 1, 2013 to May 14, 2013." ([Filing No. 14 at 17](Filing No. 14 at 17)).

Along with her administrative request for review of the ALJ's decision, LaToya R. argued, "I proved that it was not my [fault] for the overpayment. The court had reported that he had went back to Damar. They owed me over-payment." ([Filing No. 14-2 at 196](Filing No. 14-2 at 196).) However, there is no evidence in the record to support this testimony. The record reflects that LaToya R. falsely certified that she did not get help or money from any agency to pay for TR's "food, rent, mortgage payments, property insurance, property taxes, heating fuel, gas, electricity, garbage removal, water or sewerage" ([Filing No. 14-2 at 68](Filing No. 14-2 at 68)), when in fact, the State of Indiana, through Damar, was providing food, shelter and other assistance for TR at a daily rate fluctuating from $229.00 to $334.42 during the relevant time period. Regarding the amount of overpayment, because the Court is not allowed to consider evidence outside the certified record and may not reweigh the evidence or substitute its own judgment, the Court finds sufficient evidence in the record that $8,338.00 is the amount of overpayment.

However, the Court does not find substantial support for the ALJ's conclusion that LaToya R. is liable because she misused the payments. The limited explanation provided in the written decision on the issue of liability, in response to LaToya R.'s claim the overpayment was not hers, was as follows:

> However, as explained above, the claimant continued to receive supplemental security income benefits as a representative payee for her son, [TR], from February

> 2012 to January 2013, even though DCS was granted responsibility for the placement and care of [TR] during this period (Ex B9 at 9). Thus, the claimant misused Thomas's benefits (20 CFR 416.635 and 416.640). A representative payee who misuses benefits is responsible for paying back the misused benefits (20 CFR 416.641(a)). Accordingly, the claimant is responsible for paying back the benefits she misused as a representative payee for her son, [TR].

([Filing No. 14 at 18](Filing No. 14 at 18).)

While the ALJ is accurate in pointing out that the regulations specify that a representative payee is liable for any misused benefits, the Court does not find any evidence referenced in the decision, nor in the record generally, that LaToya R. actually misused the benefits as that term is defined. The ALJ cites to two regulations for authority. The first authority lists the responsibilities of a representative payee (written from the perspective of the beneficiary), which does describe a relevant responsibility to "[u]se the benefits received on your behalf only for your use and benefit in a manner and for the purposes he or she determines under the guidelines in this subpart, to be in your best interest." 20 C.F.R. § 416.635(a).[3] The second regulation cited by the ALJ, within the same subpart, relevant to use describes that the SSA "will consider that payments we certify to a representative payee have been used for the use and benefit of the beneficiary if they are used for the beneficiary's current maintenance. Current maintenance included costs incurred in obtaining food, shelter, clothing, medical care and personal comfort items." 20 C.F.R. § 416.640(a). Additionally, misuse is directly defined by statute:

> For purposes of this subsection, misuse of benefits by a representative payee occurs in any case in which the representative payee receives payment under this subchapter for the use and benefit of another person and converts such payment, or

---

[3] This regulatory section cited generally by the ALJ also includes a responsibility to "[n]otify [the SSA] of any event or change in circumstances that will affect the amount of benefits you receive, your right to receive benefits, or how you receive them." 20 C.F.R. § 416.635(a). The Court is thoroughly convinced that LaToya R. failed to honor this regulatory responsibility and additionally breached the terms of the 1996 agreement by failing to report the change in custody and placement for the care and welfare of TR, which was granted by court order to DCS. *See* ([Filing No. 35-2 at 4](Filing No. 35-2 at 4)) ("I agree to: [. . .] [n]otify the Social Security Administration when the claimant dies, leaves my custody or otherwise changes his/her living arrangements or when I no longer have responsibility for his/her care and welfare.").) However, neither the 1996 agreement nor the regulations listing the responsibilities of a representative payee establish that failure to follow their terms means that the benefits have been automatically or presumptively misused.

any part thereof, to a use other than for the use and benefit of such other person. The Commissioner of Social Security may prescribe by regulation the meaning of the term "use and benefit" for purposes of this paragraph.

42 U.S.C. § 405(j)(9). There is no evidence that LaToya R. used the payments or any portion thereof for anyone else's purposes other than for TR's. She was steadfast in her testimony that she provided TR food and shelter on the weekends and took him personal comfort items when visiting him at Damar. There is no independent factual evidence rebutting her testimony on the issue either. While the ALJ may have assumed that some of the benefits were used for another's benefit, the Court cannot uphold a determination that does not rest on any evidence of record. At the very least, the ALJ has failed to explain what evidence supports his determination that benefits were misused by LaToya R..

Nonetheless, under the terms of the 1996 agreement, the Court finds that LaToya R. is alternatively liable because she was at fault for the overpayment. LaToya R. advanced several excuses for her failure to report the change in custody and responsibility for placement and care of TR, including that either she did notify the SSA or that the court that determined the placement of TR was supposed to have notified the SSA. However, neither theory relieves her of fault under the regulations. In a regulation that describes the situations in which the SSA may waive recovery from an individual that is "without fault," it makes clear that the inquiry as to fault is limited to the conduct of that individual:

> "The overpaid individual (and any other individual from whom the Social Security Administration seeks to recover the overpayment) is not relieved of liability and is not *without fault* solely because the Social Security Administration may have been at fault in making the overpayment. In determining whether an individual is without fault, the *fault* of the overpaid person and the *fault* of individual seeking relief under the waiver provision are considered.

20 C.F.R. § 416.552 (emphasis in original).[4]  Moreover, the regulation establishes what does qualify as fault, specifying:

> Although the finding depends on all of the circumstances in the particular case, an individual will be found to have been at fault in connection with an overpayment when an incorrect payment resulted from one of the following:
>
> (a) Failure to furnish information which the individual knew or should have known was material;
>
> (b) An incorrect statement made by the individual which [she] knew or should have known was incorrect (this includes the individual's furnishing [her] opinion or conclusions when [she] was asked for facts), or
>
> (c) The individual did not return a payment which [she] knew or could have been expected to know was incorrect.

*Id.* LaToya R. admitted at the hearing that she was aware that TR's benefits should have been reduced when he was placed at Damar, in part because it had happened previously. However, she did not return the payment or otherwise ensure that the payment was properly reduced. While the regulation makes clear that the full circumstances of the case are to be considered, including "the individual's understanding of the reporting requirements, the agreement to report events affecting payments, knowledge of the occurrence of events that should have been reported, efforts to comply with the reporting requirements, [and] opportunities to comply with the reporting requirements" etc., *id.*, the Court does not find the circumstances of this particular case to excuse LaToya R.'s conduct. She specifically agreed in the 1996 agreement to report any change in custody or responsibility for the placement and care of TR. She was a party in attendance for the permanency

---

[4] As noted above, LaToya R. produced, along with this appeal, part of a notice she had received from the SSA, which she contends establishes that the SSA was at fault rather than her. The Deputy Commissioner responded to the Court's request for clarification (and produced the entire notice) with an explanation that the notice returned a portion of LaToya R.'s benefits that had been withheld to collect the overpayment, as a matter of administrative due process, because LaToya R. had appealed the determination that she was liable for the overpayment and the SSA had determined that the collection of the overpayment was premature until the appeal was reconsidered. (Filing No. 45 at 3.) The Court finds the explanation both likely and reasonable, but recognizes that under the regulations it is not material whether or not the SSA was additionally at fault, so long as LaToya R. was personally at fault.

hearing which altered the existing status of both. She had multiple opportunities to provide written notice to the SSA in response to their requests for updated information, but failed to report in any of the written notices the change in circumstances. While she alleged that she did provide oral notice to the SSA at some point, there is no evidence that she did so until the period of overpayment in question had already occurred. And as previously stated, the written documentary evidence regarding her disclosures to the SSA do not show that she provided the material information that she had agreed to provide.

Accordingly, the Court finds this error harmless. The Court can say with great confidence that remanding the case for further proceedings would result in an alternative finding that LaToya R. was at fault for the overpayment, and moreover agreed to be liable in the 1996 agreement for any overpayment that resulted from her fault. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) ("administrative error may be harmless: we will not remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result"; the inquiry is prospective where error has already been identified (citing *Spiva v. Astrue,* 628 F.3d 346, 353 (7th Cir. 2010)). LaToya R. is responsible for paying back the overpayment because she was clearly at fault for any overpayment. The decision of the Deputy Commissioner is therefore **affirmed**.

## V. CONCLUSION

For the reasons stated above, the final decision of the Deputy Commissioner is **AFFIRMED** and LaToya R.'s appeal is **denied**.

**SO ORDERED.**

Date: 9/14/2018

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

Distribution:

LaToya R.
3371 Houston Street
Indianapolis, Indiana 46218

Julie Lorraine Bentz
SOCIAL SECURITY ADMINISTRATION
julie.bentz@ssa.gov

Daniel R. Janes
SOCIAL SECURITY ADMINISTRATION
daniel.janes@ssa.gov

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
kathryn.olivier@usdoj.gov